IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VALLEY LODGE CORP., <br><br> Plaintiff, <br><br> v. <br><br> SOCIETY INSURANCE, a Mutual Company, <br><br> Defendant. | Case No.: 20 cv 2813 <br><br> Honorable John J. Tharp, Jr. <br><br> Magistrate Judge Jeffrey Cummings |

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS PURSUANT
TO LOCAL RULE 56.1(b)(3)(C)**

Plaintiff, VALLEY LODGE CORP. d/b/a THE VALLEY LODGE, by and through its attorneys, CLIFFORD LAW OFFICES, P.C., submits this statement of additional material facts pursuant to Local Rule 56.1(b)(3)(C). In support, Plaintiff states as follows:

1. Dr. Erik Richard Dubberke is a medical doctor, board certified in internal medicine and infectious disease. *See* Declaration of Erik Dubberke attached hereto as Exhibit 1, ¶¶ 1-3.

2. Dr. Dubberke's formal education is in biology (B.A.), medicine (M.D.) and public health (M.S.P.H.) with expertise in epidemiology. *Id.* at ¶ 4.

3. Dr. Dubberke is currently a Professor of Medicine in the Infectious Diseases Division of the Department of Medicine at the Washington University School of Medicine. *Id.* at ¶ 5.

4. Dr. Dubberke is currently engaged in direct care for patients with infectious disease and conducts research. Dr. Dubberke is the hospital epidemiologist at Missouri Baptist Medical Center and an associate hospital epidemiologist at Barnes-Jewish Hospital. He is involved in

decisions to prevent SARS-CoV-2 transmission in the healthcare setting to other patients and healthcare workers at both institutions. He is also involved in a project to model different approaches to prevent COVID-19 to determine the impact they have on utilization of healthcare resources. *Id.* at ¶ 6.

5. Dr. Dubberke regularly shares within his profession his clinical and epidemiological knowledge and expertise. In addition to his professorship and clinical work, he serves as editor for several professional journals and has authored several chapters, articles and papers. He is frequently invited to present on topics in infectious disease and epidemiology, and has done so at conferences, seminars and universities all over the world. *Id.* at ¶ 7.

6. Dr. Dubberke's education, training and experience is more fully set forth in his C.V. and forms the foundation of his career and expertise in infectious disease and epidemiology. *Id.* at ¶ 8.

7. Dr. Dubberke is frequently consulted for his expertise in infectious disease and epidemiology. Occasionally, he is retained as an expert in medical-legal matters, and he has been retained by the Plaintiff in this matter. *Id.* at ¶ 9.

8. Dr. Dubberke has, from time to time, testified in both state courts and federal court. He has never been barred or limited in his testimony. *Id.* at ¶ 10.

9. Dr. Dubberke has received from Plaintiff's counsel, and reviewed, all pleadings and exhibits filed to date in this matter. *Id.* at ¶ 11.

10. Dr. Dubberke has also consulted public health data, namely, CDC, WHO, Hopkins COVID site, COVID act now website; and he regularly keeps track of the St. Louis County and

2

St. Louis City COVID data and the COVID data at the hospitals where he is hospital epidemiologist. *Id.* at ¶ 12.

11. Additional materials Dr. Dubberke considered include:

a. Pastorino B, Touret F, Gilles M, de Lamballerie X, Charrel RN. Prolonged Infectivity of SARS-CoV-2 in Fomites. Emerg Infect Dis. 2020;26(9).

b. Van Doremalen N, Bushmaker T, Morris DH, Holbrook MG, Gamble A, Williamson BN, et al. Aerosol and surface stability of SARS-CoV-2 as compared with SARS-CoV-1. N Engl J Med. 2020;382:1564-7.

c. Taskforce for the COVID-19 Cruise Ship Outbreak, Yamagishi T. Environmental sampling for severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) during a coronavirus disease (COVID-19) outbreak aboard a commercial cruise ship (pre-print). MedRxiv. 2020.

d. Guo Z-D, Wang Z-Y, Zhang S-F, Li X, Li L, Li C, et al. Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020. Emerg Infect Dis. 2020;26(7).

e. Santarpia JL, Rivera DN, Herrera V, Morwitzer MJ, Creager H, Santarpia GW, et al. Transmission potential of SARS-CoV-2 in viral shedding observed at the University of Nebraska Medical Center (pre-print). MedRxiv. 2020 doi: 10.1101/2020.03.23.20039446.

*Id.* at ¶ 13.

12. The purpose of Dr. Dubberke's work in this matter was to review the clinical and epidemiological assertions made by Defendant in relation to the coronavirus and covid-19, and to provide clarification on the physical presence of SARS-CoV-2. *Id.* at ¶ 14.

13. The scope of his work included a review of the validity and accuracy of Defendant's assertions about the features and characteristics of the coronavirus. In addition, Dr. Dubberke was asked to provide clarification on the characteristics of the coronavirus and its spread and presence in the community, particularly at the time of its onset in the metro Chicago region. *Id.* at ¶ 15.

14. Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) is a betacoronavirus that is genetically related to several other zoonotic coronaviruses, including

SARS-CoV-1, the etiological agent of SARS. SARS-CoV-2 causes coronavirus disease 2019 (COVID-19) in humans. SARS-CoV-2 has glycoprotein "spikes" that are able to bind to human angiotensin converting enzyme 2 (ACE-2) receptors, which is present on human respiratory epithelial cells. After binding to ACE-2, the virus is able to enter the cells and make copies of itself, which are then released. These released infectious viral particles are then expelled in respiratory secretions as respiratory droplets during coughing, sneezing, talking, and singing. These respiratory droplets can infect other people either directly, through direct contact with respiratory mucosal surfaces, or indirectly, by contaminating surfaces which are then touched by another person who subsequently touches her or his mouth, nose, or eyes. *Id.* at ¶ 16.

15. The virus exists and is physically present in communal areas as indicated by elevated infection rates. Below is a photo of the virus on a surface, made possible with electron microscopy. The virus has been isolated in laboratory and research settings, and can be identified in those settings with several features and marked characteristics, namely, its spikes for which it is named. *Id.* at ¶ 17.


Source: NIH

16. SARS-CoV-2 is transmitted by respiratory droplets containing virus particles. Modes of human-to-human transmission for SARS-CoV-2 include contact, droplet, airborne, and fomites. It is less clear if it is transmitted by fecal-oral, bloodborne, or in utero mother-to-child. *Id.* at ¶ 18.

17. The virus is indirectly transmitted when a host touches a contaminated object or surface that is contaminated with the SAR-CoV-2 virus (i.e., fomite transmission). The virus can survive on hard and soft surfaces for a period of time ranging from a few hours to a few days. *See* Pastorino B, Touret F, Gilles M, de Lamballerie X, Charrel RN. Prolonged Infectivity of SARS-CoV-2 in Fomites. Emerg Infect Dis. 2020;26(9); Van Doremalen N, Bushmaker T, Morris DH, Holbrook MG, Gamble A, Williamson BN, et al. Aerosol and surface stability of SARS-CoV-2 as compared with SARS-CoV-1. N Engl J Med. 2020;382:1564-7. *Id.* at ¶ 19.

18. Short-range aerosol transmission, particularly in crowded and inadequately ventilated spaces over a prolonged period of time with infected persons, is believed to be a common mode of transmission in crowded settings. However, infection clusters suggest that droplet and fomite transmission also explain transmission amongst humans. (See Taskforce for the COVID-19 Cruise Ship Outbreak, Yamagishi T. Environmental sampling for severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) during a coronavirus disease (COVID-19) outbreak aboard a commercial cruise ship (pre-print). *See* MedRxiv. 2020; Guo Z-D, Wang Z-Y, Zhang S-F, Li X, Li L, Li C, et al. Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020. Emerg Infect Dis. 2020;26(7); Santarpia JL, Rivera DN, Herrera V, Morwitzer MJ, Creager H, Santarpia GW, et al. Transmission potential of SARS-CoV-2 in viral shedding observed at the University of Nebraska Medical Center (pre-print). MedRxiv. 2020 doi: 10.1101/2020.03.23.20039446.) *Id.* at ¶ 20.

19. The coronavirus guidance from the CDC has been the subject of rigorous challenge and discussion in the medical community, particularly amongst infectious disease specialists. CDC guidance or commentary is not universally accepted as the gold standard of infection control. Importantly, the CDC throughout its website places qualifiers and limitations on its suggestions, frequently deferring to local and state government guidance, including in supplying guidance to restaurants. (see https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/business-employers/bars-restaurants.html, accessed Aug. 8, 2020). CDC guidance and commentary is one government source of information the public may consult. *Id.* at ¶ 21.

20. Citing a CDC publication, *Guidance For Cleaning And Disinfecting Public Spaces, Workplaces, Businesses, Schools, And Homes,* Defendant contends that "the virus that causes COVID-19 can be removed from surfaces using soap and water." (See Dkt. 18, para. 2). Defendant also states that "the virus that causes COVID-19 can be destroyed on surfaces using a number of ordinary household disinfectants, including bleach." (See Dkt. 18, para. 3). *Id.* at ¶ 22.

21. While it is true that soap and water can reduce the risk of transmission, and also true that certain disinfectants when properly applied to the virus can destroy the virus, the virus and the disinfectants cited have features that do not allow these two efforts to consistently and reliably eradicate the virus in a public space. *Id.* at ¶ 23.

22. Nonetheless, the virus, while imperceptible to the human eye without enhancement, is undeniably present on objects and surfaces where infected humans congregate. The object and surface are, essentially, rendered useless, in that they should not be handled while virus is present. *Id.* at ¶ 24.

23. The virus cannot be observed by the human eye without enhancement. No one can see the virus on one's hands or on a surface. This, of course, makes it difficult to eliminate the

6

virus, or eradicate its transmission, with soap and water or even the use of a proper bleach solution. The presence of the virus is only observed through the infection rate. The infection rate in the Chicago metro region has been well documented from March through the present, with particular intensity in March, April and May. *Id.* at ¶ 25.

24. In a public setting, such as a restaurant, merely applying bleach to hard surfaces, as Defendant suggests, may reduce but does not altogether eliminate the risk of transmission amongst restaurant staff and patrons. In other words, disinfection may temporarily eliminate a virus that was present prior to disinfection; however, a surface may immediately become contaminated thereafter if an infected person is present in the area. Further, the challenges of keeping a restaurant free from virus contamination extend beyond disinfection because people will necessarily need to remove their masks when eating and drinking, and thus, infected people will continuously emit infectious viral particles to others. This fact was demonstrated in Guangzhou, China, in early 2020, when the transmission of the coronavirus was observed amongst restaurant patrons. (See Lu J, Gu J, Li K, et al. *COVID-19 Outbreak Associated with Air Conditioning in Restaurant*, Guangzhou, China, 2020. Emerging Infectious Diseases. 2020; 26(7):1628-1631. doi:10.3201/eid2607.200764.). In that study, it was determined that the air flow of the restaurant's HVAC system contributed to the spread of the virus. *Id.* at ¶ 26.

25. Moreover, the reliability of bleach is challenged by the fact that it is easily inactivated by organic material; requires time ranging from 10 minutes to 60 minutes to disinfect against the virus; and, is rendered useless if not mixed in the correct ratio. (See *Infection Prevention and Control of Epidemic- and Pandemic-Prone Acute Respiratory Infections in Health Care*. Geneva: World Health Organization; 2014. Annex G, Use of disinfectants: alcohol and bleach.). *Id.* at ¶ 27.

26. An object or surface should not be used during the disinfection process. The presence of the virus, whether circulating or stagnant, has changed the object, surface or premises, in that it has become dangerous to handle and cannot be used. Its use can only be restored with remedial action, as suggested by the CDC and other infectious disease experts. Either a prolonged passage of time, or a precise cleaning and disinfection plan, must be applied to the surface or premises to restore its safe use. *Id.* at ¶ 28.

27. Irrespective of whether the virus can be eliminated or its quantity reduced by adequate handwashing or properly applied disinfectants, it must be noted that the virus, observable only through microscopy and reflected by the public transmission rates, does physically exist and will survive on hard and soft surfaces, especially "high-touch" surfaces. The virus can remain viable and infectious in aerosols for hours and on surfaces up to days. (See Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, N Engl J Med 382; 16 nejm.org, April 16, 2020). The virus may spread to hands from a contaminated surface and then to the nose or mouth, causing infection. Notably, disinfection of a contaminated surface is temporary and will easily become contaminated when the virus is reintroduced to the surface, and this contaminated surface will provide a constant modality for indirect infection to people. *Id.* at ¶ 29.

28. The virus' presence in a community, evidenced by infection rates, makes it more probably true than not, that live virus has been transferred to objects and surfaces. When an object or surface contains live virus, the virus is physically present on surfaces and objects, but imperceptible to the human eye. Nevertheless, the objects and surfaces should not be used. The transmission of the virus can occur through touching surfaces or objects contaminated with virus from an infected person (e.g. flatware, table, chair, door handle, menu, cash register, toilet, faucet), mostly when followed by touching the mouth, nose, or eyes. *Id.* at ¶ 30.

29. Transmission of COVID-19 may occur when a susceptible person has contact with live virus present on an object or surface, and the person then introduces the virus to its system, usually by touching one's nose or mouth. With fomite transmission, the virus is physically present on a surface or object and the object or surface require a remedial response. *Id.* at ¶ 31.

30. Fomite transmission is one basis for social distancing, hand-washing, stay-at-home orders, home-shelter orders, distance learning, reduced capacity and/or occupancy limits, and other measures implemented in various executive orders, including the order entered in the State of Illinois. The virus is physically present in the community, including on objects and surfaces. Fomite transmission is real, and due to constant recontamination of surface areas, it is simply impossible to entirely eradicate the virus from such surfaces. *Id.* at ¶ 32.

31. Reducing capacity in public settings is one way to reduce the presence of virus on objects and surfaces and, therefore, reduce the risk of transmission, especially during times of rising infection rates, such as what the Chicago metro area experienced in the Spring. Wearing masks reduces, but does not eliminate, the likelihood of virus being transferred to objects and hard surfaces. However, in a restaurant setting, where masks cannot be worn while eating and drinking, the likelihood of virus being transferred to objects and surfaces is increased. This is true even if patrons and staff are asymptomatic. *Id.* at ¶ 33.

32. Even with cleaning and disinfecting, the presence of virus on objects and surfaces, though reduced, cannot be reliably eliminated because these surfaces will continue to become contaminated as people spread the virus throughout their dining experience (i.e., drinking and eating without a mask and touching nose or mouth and contacting surface areas). The only way to ensure the absence of virus on objects and surfaces is to prevent access to an environment, especially an indoor environment with full capacity. *Id.* at ¶ 34.

33. There is presently no ability for a lay person to determine that the virus has been entirely eliminated from objects and surfaces in an environment populated by people. At the relevant time, the most reputable method of reducing transmission and infection rates (which was the purpose of the executive order) was to reduce the opportunities for the virus to be circulated in public environments. This included reducing opportunities for person-to-person transmission, as well as reducing opportunities for the virus to be transferred to objects and surfaces, i.e., fomite transmission opportunities. *Id.* at ¶ 35.

34. In July 2006, Insurance Services Office ("ISO"), a nonprofit corporation the members of which are insurance companies, circulated a specific virus exclusion recognizing the potential for coverage due to loss resulting from virus or bacteria. *See* ISO Circular, "New Endorsements Filed To Address Exclusion Of Loss Due To Virus Or Bacteria." (July 6, 2006) attached hereto as Exhibit 2.

Respectfully submitted,

VALLEY LODGE CORP.

By: /s/ Shannon M. McNulty
Richard F. Burke, Jr.
RFB@cliffordlaw.com
Shannon M. McNulty
SMM@cliffordlaw.com
James C. Pullos
JCP@cliffordlaw.com
**CLIFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Shannon M. McNulty, an attorney, hereby certify that on August 10, 2020, I served the above and foregoing PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS PURSUANT TO LOCAL RULE 56.1(b)(3)(C), by causing a true and accurate copy of such papers to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system.

By: /s/ Shannon M. McNulty
Richard F. Burke, Jr.
RFB@cliffordlaw.com
Shannon M. McNulty
SMM@cliffordlaw.com
James C. Pullos
JCP@cliffordlaw.com
**CLIFFORD LAW OFFICES, P.C.**
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090

*Attorneys for Plaintiff*